CLERK'S OFFICE U.S. DIST. COURT
AT BIG STONE GAP, VA
FILED

FEB 1 4 2008

JOHN F CORCORAN, CLERK
BY: _____
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ROBIN N. MULLINS,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:07cv00031 |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | BY: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** | ) | SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. | ) | |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Robin N. Mullins, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Mullins's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a

reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Mullins protectively filed her applications for SSI and DIB on May 3, 2004, alleging disability as of April 4, 2004,[1] due to fractures of the lower limb and dislocations of both hips. (Record, ("R."), at 17, 28, 56-59, 295-98.) The claims were denied initially and upon reconsideration. (R. at 28-32, 35-39, 299-302, 305-08.) Mullins then requested a hearing before an administrative law judge, ("ALJ"). (R. at 40.) A hearing was held before the ALJ on March 14, 2006, at which Mullins was represented by counsel. (R. at 309-27.)

By decision dated April 28, 2006, the ALJ denied Mullins's claims. (R. at 17-24.) The ALJ found that Mullins met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 23.) The ALJ determined that Mullins had not engaged in substantial gainful activity at any time pertinent to his decision. (R. at 23.) The ALJ also found that Mullins suffered from a musculoskeletal impairment related to her bilateral hip pain and an emotional disorder, which he considered "severe" based on the requirements of 20 C.F.R. §§ 404.1520(b) and 416.920(b). (R. at 23.) However, the ALJ determined that Mullins

---

[1] At the administrative hearing, Mullins amended her alleged onset of disability date from April 4, 2004, to April 5, 2004. (R. at 17, 311.)

did not have an impairment or combination of impairments that met or medically equaled the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) In addition, the ALJ found that Mullins's allegations regarding her limitations were not totally credible. (R. at 24.) The ALJ also found that Mullins possessed the residual functional capacity to perform light[2] and sedentary[3] work, and that she suffered from an emotional disorder that resulted in mild to moderate restrictions regarding her ability to perform work-related activities. (R. at 24.) The ALJ found that Mullins's past relevant work as a sewing machine operator did not require the performance of the work-related activities precluded by her residual functional capacity; thus, he concluded that Mullins's impairments did not prevent her from performing her past relevant work. (R. at 24.) In the alternative, the ALJ pointed out that, even if Mullins was unable to perform her past relevant work, she would still be able to perform other jobs that exist in significant numbers in the regional and national economies, including light work jobs as a cleaner, a miscellaneous food prep worker, a machine operator, an inspector, a hand packer and an administrative support worker, and sedentary work jobs as an inspector, a hand packer, an information clerk, a dispatcher and an administrative support worker. (R. at 23.) Therefore, the ALJ found that Mullins was not under a "disability" as defined under the Act and was not entitled to benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007).

[3] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2007).

After the ALJ issued his decision, Mullins pursued her administrative appeals and sought review of the ALJ's decision by the Appeals Council. (R. at 12-13.) The Appeals Council denied Mullins's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 4-6.) *See* C.F.R. §§ 404.981, 416.1481 (2007). This case is currently before the court on Mullins's motion for summary judgment, filed November 15, 2007, and on the Commissioner's motion for summary judgment, filed December 12, 2007.

## *II. Facts*

Mullins was born in 1966, which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). (R. at 56, 295, 313.) According to the record, Mullins obtained her general equivalency development diploma, ("GED"), in 1983; thus, Mullins has a "high school education" pursuant to C.F.R. §§ 404.1564(b)(4), 416.964(b)(4). (R. at 18, 101, 313.) In addition, Mullins has past relevant work as a sewing machine operator and restaurant worker. (R. at 65-72, 323-24.)

At Mullins's hearing before the ALJ on March 14, 2006, she testified that she was last employed at a restaurant as a server. (R. at 313.) She also explained that, within the last 15 years, she worked as a sewing machine operator. (R. at 313.) Mullins acknowledged that she was involved in a car accident in April 2004 that resulted in serious medical problems. (R. at 313-14.) Mullins indicated that the accident caused problems in her ability to walk and think. (R. at 314.) Mullins explained that she experienced pain in both hips, her hand, back and neck, as well as pain throughout her body caused by arthritis. (R. at 314.) Mullins testified that these

problems caused her to "stumble a lot." (R. at 314.) Mullins stated that she would like to return to work; however, she indicated that she was not capable of performing certain tasks. (R. at 314.) Mullins testified that she was hospitalized in November 2004, due to depression. (R. at 314.) She commented that, at the time of the hearing, she was being treated by a mental health professional. (R. at 314.)

The ALJ asked Mullins if her situation was gradually improving, to which Mullins responded, "[s]ome days I feel like it is and other days I feel like I'm getting worse. I mean . . . I feel like there's days when . . . I can't even move and I can't . . . get anything done." (R. at 315.) She further explained that she could not think straight and that she could not walk or sit for long periods of time. (R. at 315.) Mullins also was questioned as to how her depression impacted her social life. (R. at 315.) She testified that she was capable of driving a car, but she had no desire to drive and that she feared driving. (R. at 315.) Mullins testified that it had been more than a year since she had last driven. (R. at 315-16.) Mullins acknowledged that she was charged with driving under the influence, ("DUI"), in the accident which caused her allegedly disabling injuries. (R. at 316.) Upon further inquiry, Mullins admitted that she lost her license as a result of the DUI charge. (R. at 317.) The ALJ asked Mullins to describe her social life. (R. at 318.) She testified that she did not have a social life, other than occasionally attending church with her father, and she remarked that she did not like being around other people. (R. at 318.)

Mullins's counsel asked further questions regarding the car accident. (R. at 318.) Mullins explained that the accident was the result of fatigue and anger, and she stated that she passed out behind the wheel. (R. at 319.) She testified that, after

being released from the hospital, the accident caused her to remain in a hospital bed for approximately two and a half months in her home. (R. at 319.) She indicated that she also had to use a wheelchair. (R. at 319.) Mullins stated that the physical therapists had to teach her to get up and walk. (R. at 320.) In addition, she explained that both her hips were dislocated in the car accident. (R. at 320.) Mullins testified that her injury caused severe pain to both hips and that "they pop and . . . just hurt," causing her to be unable to sit in one position. (R. at 320.) Mullins also testified that she suffered from severe arthritis in her hands and that the condition affects her ability to use her hands. (R. at 320-21.)

Mullins acknowledged that she was on several medications, but reported no side effects from the medications, other than minimal weight loss. (R. at 321.) She testified that she does not do housework and explained that her daughter takes care of those duties. (R. at 321.) Mullins stated that she does not have any hobbies. (R. at 321.) Mullins also indicated that, on occasion, she experienced difficulty remembering to take her medications and that she required reminders to make sure she took her medication properly. (R. at 322.) Additionally, Mullins testified that she suffers from confusion and that she has difficulty concentrating. (R. at 322.) Mullins further testified that she has headaches approximately three to four times per week, which she treats with over the counter medication. (R. at 323.)

Cathy Sanders, a vocational expert, also testified at Mullins's hearing. (R. at 323-26.) Sanders identified Mullins's past relevant work as a sewing machine operator as light work, and her work as a restaurant worker as either light, unskilled or medium, unskilled, depending on which of Mullins's specific restaurant jobs you

consider. (R. at 323-24.) The ALJ then asked Sanders to consider a hypothetical claimant of the same height, weight, education and work background as Mullins, who retained the residual functional capacity to perform light and sedentary work activities. (R. at 324.) In addition, the ALJ asked Sanders to assume that the hypothetical claimant had an emotional disorder that caused mild to moderate restrictions regarding her ability to perform work activities. (R. at 324.) Based upon this hypothetical, the ALJ asked Sanders to identify any jobs that a person with the previously described restrictions could perform. (R. at 324.) Sanders opined that such an individual could perform light jobs such as a cleaner, a machine operator, an inspector and jobs related to miscellaneous food preparation. (R. at 324.) Sanders also stated that such an individual could perform work as a hand packer, which is considered both light and sedentary work. (R. at 324.) As for jobs within the sedentary category, Sanders identified jobs such as an information clerk, a dispatcher and in administrative support. (R. at 325.)

The ALJ also asked Sanders to assume that Mullins's testimony as to her alleged limitations was credible. (R. at 325.) Based upon that assumption, he asked Sanders if a hypothetical individual with those limitations would be capable of performing the jobs identified. (R. at 325.) Sanders opined that the individual could not perform those jobs because Mullins described cognitive difficulties, hip pain and pain while walking and sitting, in addition to memory problems. (R. at 325.) Thus, assuming that Mullins's testimony was credible, Sanders determined that Mullins would be unable to tolerate a typical eight-hour workday. (R. at 325.) Mullins's counsel then asked Sanders to consider a person who possessed a Global Assessment

of Functioning, ("GAF"),[4] score of 50 to 55, and whether that person would be able to perform the previously identified occupations. (R. at 326.) Sanders explained that vocational experts liked to see a GAF of approximately 60 before the individual is placed in a certain category, and she also explained that it is preferred that the individual be at that GAF level for one year to demonstrate stability. (R. at 326.) Sanders agreed that a GAF score of 50 to 55 would make it difficult for an individual to perform the jobs she identified. (R. at 326.)

In rendering his decision, the ALJ reviewed records from St. Mary's Hospital, ("St. Mary's"); Lonesome Pine Hospital; Holston Valley Medical Center, ("HVMC"); Holston Valley Emergency Room; Dr. Daniel F. Klinar, M.D.; Dr. Larry D. Luethke, M.D.; Dr. Jeffrey T. Hunt, M.D.; Blue Ridge Neuroscience Center, P.C., ("BRNC"); Dr. Jolanta Herrera, M.D.; Dr. Paul C. Peterson, M.D.; Kristie J. Nies, Ph.D.; R.J. Milan Jr., Ph.D, a state agency psychologist; Julie Jennings, Ph.D, a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Richard M. Surrusco, M.D., a state agency physician; Deidre F. Taylor, Licensed Clinical Social Worker, ("LCSW"); and Bristol Regional Medical Center, ("BRMC").

---

[4] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

A GAF of 41-50 indicates that the individual has "[s]erious symptoms . . . OR any serious impairment in social, occupational, or social functioning." DSM-IV at 32.

A GAF of 51-60 indicates that the individual has "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." DSM-IV at 32.

The medical records relevant to Mullins's allegedly disabling conditions begin when Mullins presented to the Lonesome Pine Hospital emergency room late on the night of April 4, 2004. (R. at 162-67.) Mullins was involved in an automobile accident when she apparently lost control of her vehicle and collided with a tree. (R. at 162-67.) Mullins complained of severe head, knee, elbow and hip pain. (R. at 163.) In addition, she suffered lacerations to her forehead, knee and elbow. (R. at 163.) Upon examination, Mullins's pelvis was stable, but the records indicated that she had bony point tenderness and that it was painful to bear weight because of her hip pain and range of motion deformity. (R. at 164.) According to the record, Mullins was possibly intoxicated, very combative and not cooperative upon presentation to the emergency room. (R. at 163-64.) An x-ray of the cervical spine showed a very limited cross table lateral view up to the C5. (R. at 173.) This x-ray did not reveal any definite acute fractures and there was minimal irregularity of the anterior outline of the C2 vertebral body. (R. at 173.) However, minimal soft tissue swelling was observed. (R. at 173.) After the initial examination, Mullins was transported to HVMC for further testing and evaluation.

On April 5, 2004, at HVMC, a series of computerized axial tomography, ("CT"), scans and x-rays were performed on Mullins. (R. at 178-86.) The records show that a CT scan, without contrast, of Mullins's head revealed post traumatic subarachnoid hemorrhage, possible small hemorrhagic contusions to the inferior frontal lobes involving the gyrus rectus regions right greater than left, left parasagittal frontal bone fracture extending through the anterior and posterior walls of the left frontal sinus and post traumatic opacification of the paranasal sinuses. (R. at 179.)

A CT scan of the chest with intravenous, ("IV"), contrast also was performed. (R. at 179-80.) The scan revealed bilateral dependent volume loss, with no evidence of great vessel injury, and showed the endotracheal tube tip at the carina. (R. at 180.) A CT scan of the abdomen with oral and IV contrast did not identify any trauma-related abnormalities. (R. at 180.) A CT scan of the pelvis with oral and IV contrast showed a fracture of the posterior lip of the right acetabulum with a probable intraarticular bony fragment, and a possible 7mm loose body inferior portion of the left hip joint not interposed between the articular surfaces or the femoral head and acetabulum. (R. at 180-81.) Additionally, a CT scan of the cervical spine without contrast was taken, which revealed degenerative changes to the mid cervical spine, but no trauma-related abnormalities were identified. (R. at 182.)

An x-ray of the flexion, extension and neutral lateral views of the cervical spine also was completed. (R. at 183.) The x-ray showed spondylotic changes at C5-6, with no trauma-related abnormalities identified. (R. at 183.) A single view of the pelvis demonstrated a dislocation at both hips, with the right hip dislocated posteriorly and proximally, and the left hip dislocated anteriorly and inferiorly. (R. at 184.) There was a small ossific fragment seen at the lateral aspect of the right hip, which was likely related to an impaction fracture fragment. (R. at 184.) A single view of the chest showed that an endotracheal tube had been placed above the carina. (R. at 184.) No pneumothoraces were identified and the superior mediastinum and heart size were within normal limits. (R. at 184.) Gaseous distention of the stomach was noted. (R. at 184.) Also, a mild infiltrate was observed in the infrahilar regions, which possibly represented small areas of pulmonary contusion versus atelectasis. (R. at 185.) Furthermore, a two view right knee series revealed no joint effusion and

no fracture, osseous or articular abnormalities. (R. at 185.) An elongation which involved the fibular styloid process was observed, but it was not believed to be the result of an acute fracture, but, instead, may have related to remote trauma. (R. at 185.) A frontal view of the chest found no injury, as the mediastinum was unremarkable and the lungs were well-inflated without any contusion or pneumothorax. (R. at 186.)

Dr. David F. Klinar, M.D., examined Mullins on April 5, 2004. (R. at 143-44.) After reviewing the relevant CT scans and x-rays, Dr. Klinar reported a posterior dislocation at the right hip and an anterior dislocation at the left hip. (R. at 143-44.) He noted that the hips were reduced in the emergency room and that Mullins was placed in an abduction pillow. (R. at 144.) Dr. Klinar also referenced the possibility of an arthrotomy to extract bone fragments if the fragments remained incarcerated in the joint on the right and if the hip remained widened. (R. at 144.) He immobilized Mullins in an abduction pillow and ordered non-weight bearing on her lower extremities. (R. at 144.) Dr. Klinar noted that Mullins tolerated the procedures well. (R. at 144.)

Mullins also was examined by a neurosurgical physician on April 5, 2004. (R. at 145-46.) The medical records reported a closed head injury with traumatic subarachnoid hemorrhage and a Glasgow Coma Scale, ("GCS"), of 14. (R. at 145.) In addition, a left frontal parasagittal fracture of the inner and outer wall of the frontal sinus with overlying laceration was noted, as well as anterior dislocation with a femoral head fracture of the left hip and posterior dislocation of the right hip. (R. at 145.) A repeat CT scan of the head and x-rays of the cervical spine were ordered. (R.

at 145.) A maxillofacial surgery consultation also was recommended. (R. at 145.)

Dr. Larry D. Luethke, M.D., also examined Mullins on April 5, 2004. (R. at 147.) Dr. Luethke was requested in reference to oral and maxillofacial surgery. (R. at 147.) He observed multiple lacerations on the forehead, which had been sutured. (R. at 147.) He also noted contusions to the left face and periorbital region; however, no other facial fractures, other than those in the frontal region, were observed. (R. at 147.) After reviewing the relevant CT scans, Dr. Luethke reported that Mullins appeared to have a non-displaced fracture of the frontal bone which extended through the frontal sinus area, both inner and outer table. (R. at 147.) No intracranial air was noted. (R. at 147.) Dr. Luethke explained that he did not normally treat frontal sinus fractures, thus, he contacted Dr. Jeffrey T. Hunt, M.D., an otolaryngologist, who agreed to see Mullins. (R. at 147.)

Dr. Hunt examined Mullins on April 6, 2004, and reported that the CT scan revealed a linear vertical nondisplaced fracture near the midline frontal sinus, which extended into the frontal bone. (R. at 148.) However, he found that the fracture did not involve the anterior and posterior tables and that no fluid was present within the frontal sinus. (R. at 148.) Dr. Hunt observed some thickening of fluid within the ethmoid sinuses. (R. at 148.) He diagnosed Mullins with a non-displaced frontal sinus fracture and advised her to limit activity with no straining in order to increase intracerebral pressure. (R. at 148-49.)

On April 6, 2004, a head CT scan was ordered and compared to the April 5, 2004, scan. (R. at 177.) This scan revealed a decrease in the size in the amount of

subarachnoid hemorrhage that was seen in the suprasellar cistern. (R. at 177.) No new abnormalities were identified. (R. at 177.) A single view of the pelvis also was conducted on April 6, 2004, which showed the hips to be in anatomic alignment, and suggested a fracture of the posterior rim of the right acetabulum. (R. at 175.) Another single view of the pelvis was taken on April 7, 2004, and again revealed a right acetabular rim fracture. (R. at 174.) A portion of the left hip joint was obscured by an overlying metallic fixation device. (R. at 174.) The sacrum was largely obscured as well and the pubic rami appeared to be intact. (R. at 174.) On April 7, 2004, an operative report by Dr. Klinar noted that his post-operative diagnoses were the same as his pre-operative diagnoses. (R. at 142.) Mullins was discharged on April 10, 2004. (R. at 140.)

On April 12, 2004, Mullins presented to HVMC emergency room and complained of dizziness, severe headaches and severe pain. (R. at 190-92.) A CT scan of the head without contrast was ordered and was compared to the April 6, 2004, CT scan. (R. at 193-94.) The scan revealed resolution of the subarachnoid hemorrhage in the suprasellar cistern and no indications of acute infarction, intracranial hemorrhage, mass, mass effect or midline shift were noted. (R. at 193.) In addition, there was no abnormal extra-axial fluid collection or mass. (R. at 193.) The cerebral sulci and ventricles had normal size and configuration, and the cerebellum and brainstem were unremarkable. (R. at 193.) The non-displaced fracture of the left frontal sinus was again observed and a large amount of residual blood remained in the sphenoid sinus. (R. at 193.) Similarly, the frontal sinuses were opacified with blood. (R. at 193.) Mullins was prescribed Percocet to address the pain. (R. at 190.)

Mullins presented to HVMC for a follow-up appointment on April 14, 2004, and complained of headaches. (R. at 187-89.) Mullins indicated that her headaches had improved as a result of changing her pain medication from Lortab to Percocet. (R. at 189.) Other than the headaches, Mullins was doing well and showed the ability to move all of her extremities well, with fairly good strength. (R. at 189.) At this visit, Mullins continued non-weight bearing activity as recommended by the orthopedic specialist. (R. at 189.) Her forehead lacerations were improving and all stitches had been removed. (R. at 189.) Mullins was advised to follow up with Dr. Klinar, Dr. Peterson and Dr. Hunt. (R. at 189.)

Mullins presented to Dr. Klinar on April 27, 2004. (R. at 196.) Dr. Klinar noted that Mullins had good motion in both hips and her neurovascular examination was normal. (R. at 196.) Mullins was instructed to continue bed to chair transfers, to continue taking Lovenox and to return in one month with an anteroposterior, ("AP"), pelvis x-ray. (R. at 196.) Mullins returned on May 25, 2004, and Dr. Klinar noted that she was doing well, with good movement in both hips. (R. at 195.) A neurovascular examination was once again normal and she was told that she could begin weight bearing as tolerated. (R. at 195.) A review of the AP pelvis x-ray showed satisfactory reduction of both hips. (R. at 195.) Mullins was instructed to return in one month and to discontinue Lovenox. (R. at 195.)

Mullins presented to BRNC on April 27, 2004, where she was examined by Dr. Paul C. Peterson, M.D. (R. at 202-04.) Mullins was referred to BRNC in regards to her closed head injury. (R. at 202.) Mullins complained of headaches that affected the occipital region and also complained of intermittent dizzy spells that last

approximately 10 seconds each. (R. at 202.) In addition, Mullins explained that she experienced difficulty with concentration. (R. at 202.) Mullins also reported a history of fibromyalgia, anxiety, a ruptured ear drum, temporomandibular joint disorder, ("TMJ"), and arthritis. (R. at 202.)

Upon examination, Dr. Peterson noted that Mullins was alert and cooperative and that she did not appear to be in acute distress. (R. at 203.) All other physical examination was essentially unremarkable. (R. at 203.) A neurological examination showed that finger-to-nose testing was performed without difficulty, rapid alternating band movements were performed without difficulty, an examination of gait and station was unremarkable, her tandem gait was performed without difficulty, Romberg's testing was negative and there was no pronator drift. (R. at 203.) Furthermore, hypesthesias was found on Mullins's forehead and her deep tendon reflexes were normal. (R. at 203.) Mullins's cranial nerves examination also was normal. (R. at 203-04.)

A review of Mullins's mental status indicated that she appeared to be mildly depressed and that there was a mild deficit of remote memory. (R. at 204.) Dr. Peterson diagnosed Mullins with post concussive syndrome and noted that her subarachnoid hemorrhage was resolved. (R. at 204.) Dr. Peterson discussed his findings and the various treatment options, including continued observation and conservative treatment versus surgical intervention. (R. at 204.) Moreover, he found no need for additional diagnostic studies and determined that, from a neurosurgical standpoint, Mullins could return to work. (R. at 204.)

Mullins presented for a follow-up appointment with Dr. Peterson on September 28, 2004. (R. at 198-201.) Dr. Peterson noted that Mullins continued to experience headaches along the frontal region with occasional blurred vision. (R. at 198.) He also noted that Mullins continued to have problems with short-term memory and concentration. (R. at 198.) Mullins complained of cervical pain, which Dr. Peterson described as musculoskeletal in nature, and also complained of low back pain with associated right hip pain secondary to surgical intervention to remove bone fragments. (R. at 198.) Mullins denied any new onset focal or lateralizing neurological difficulties. (R. at 198.) Dr. Peterson explained that Mullins's primary concern was her memory and the fact that she was unable to return to her previous employment due to inability to concentrate and perform activities that required a moderate amount of physical strength. (R. at 198.)

Mullins also reported depression, which she attributed to recent changes in her life. (R. at 198.) Mullins's condition was relatively the same as her previous visit; however, Dr. Peterson noted that Mullins appeared to be moderately depressed and flat during the interview and examination. (R. at 198-200.) He again reported a mild deficit of recent memory. (R. at 200.) Dr. Peterson diagnosed Mullins with stable post concussive syndrome, resolved subarachnoid hemorrhage, generalized anxiety disorder and major depressive disorder, moderate with recurrent episodes. (R. at 200.) No surgical interventions were deemed necessary. (R. at 200.) Dr. Peterson recommended continued psychological counseling and an increase in antidepressant medication until Mullins's psychological issues were stabilized. (R. at 200.) Dr. Peterson found that Mullins was capable of returning to her employment activities as a cook, but pointed out that specific work-related issues would be left up to the

primary care provider. (R. at 200.)

Mullins presented to Kristie J. Nies, Ph.D., on June 11, 2004, as recommended by Dr. Peterson. (R. at 206-09.) Mullins complained of headaches, dizziness, difficulty with concentration, memory difficulty, neck and tailbone pain and fatigue. (R. at 206.) Nies noted that Mullins was very slow to respond and that she often looked confused. (R. at 206.) Mullins's receptive language for conversation appeared to be intact, but she seemed to have difficulty understanding/retaining directions, as repetition was frequently required. (R. at 206.) No evidence of frank dysphasia was observed. (R. at 206.) Mullins's affect was reported as appropriate and her mood was dysphoric with occasional tearfulness. (R. at 206.) Mullins informed Nies that she slept all of the time and that she experienced dizzy spells. (R. at 206.) Mullins explained that she experienced difficulty with attention and memory, and that she sometimes forgot conversations and what she was communicating in a conversation. (R. at 206.) Despite the previously mentioned problems, Mullins indicated that she did remember to take her medication. (R. at 207.) In addition, Mullins acknowledged stress with regards to her health, marriage, family and occupation. (R. at 207.) Mullins described her neck, pelvis and tailbone pain as six or seven on a 10 point scale. (R. at 207.) Nies also reported that Mullins alleged a persistent sad mood, hypersomnia, decreased appetite, decreased interesting activities, feelings of worthlessness and fatigue, all of which began following the car accident. (R. at 207.) However, Mullins identified lifelong difficulty controlling excess work, restlessness, irritability and muscle tension. (R. at 207.) Mullins also reported symptoms consistent with a panic disorder. (R. at 207.) Nies noted that Mullins did not indicate any symptoms of mania, psychotic features, suicidal/homicidal ideations

or obsessions/compulsions. (R. at 207.)

Mullins performed within the moderately to severely impaired range on a scanning and sequencing test of cognitive functioning, and when the task became complex, requiring shifting of mental set, Mullins performed in the mildly to moderately impaired range. (R. at 208.) Her visual perceptual functioning was found to be average, as was her memory and learning ability. (R. at 208.) Mullins performed with poor effort on three out of three subsets. (R. at 208.) Additionally, mood and personality evaluations suggested distress regarding physical functioning, depression, anxiety and peculiarities in thinking and experience. (R. at 208.) Nies concluded that Mullins's scores were likely invalid because a failure in the effort category is interpreted as evidence of inconsistent effort and raises questions as to the validity of the test results and self-reported symptoms. (R. at 208.) Nies pointed out that her inconsistency in performance did not mean that Mullins did not have genuine problems. (R. at 208.) Instead, Mullins simply presented in a way that made it impossible to determine which scores accurately reflected her cognitive functioning ability. (R. at 208-09.) Despite these findings, no evidence of malingering was noted. (R. at 209.)

Nies classified Mullins's injury as mild and explained that many of Mullins's complaints were normal following a brain injury, but further explained that those type of injuries gradually resolve over days to weeks. (R. at 209.) Nies determined that the etiology of Mullins's day to day difficulties was likely a combination of pain, peripheral injury, mood disturbance and high levels of somatic awareness rather than frank neurological disruption. (R. at 209.) Mullins was diagnosed with post

concussion syndrome, generalized anxiety disorder, major depressive disorder, recurrent, moderate and minor cognitive changes were ruled out. (R. at 209.) Nies noted that Mullins's mood disturbance warranted pharmacological and psychological treatment and that she may benefit from educational information regarding recovery from concussions. (R. at 209.)

A Psychiatric Review Technique form, ("PRTF"), was completed on July 6, 2004, by R. J. Milan Jr., Ph.D., a state agency psychologist. (R. at 210-23.) Milan found that Mullins suffered from an affective disorder and an anxiety-related disorder, but that these impairments were not severe. (R. at 213, 215.) More specifically, Milan noted that Mullins's generalized anxiety disorder and major depressive disorder, moderate, did not precisely satisfy the diagnostic criteria. (R. at 213, 215.) Milan determined that Mullins was moderately limited in her activities of daily living and in maintaining concentration, persistence or pace. (R. at 220.) Furthermore, he found that Mullins was mildly limited in her ability to maintain social functioning and that she had not experienced any episodes of decompensation. (R. at 220.) This assessment was affirmed by Julie Jennings, Ph.D., on January 20, 2005. (R. at 210.)

Milan also completed a mental residual functional capacity assessment on July 6, 2004. (R. at 224-27.) Milan determined that Mullins was not significantly limited in any of the following areas: the ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; to carry out very short and simple instructions; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being

distracted by them; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (R. at 224-25.) However, he found that Mullins was moderately limited in her ability to understand and remember detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 224-25.) There was no evidence of limitation in Mullins's ability to ask simple questions or request assistance, or in her ability to make simple work-related decisions. (R. at 224-25.)

In addition, Milan noted that there was no objective support for Mullins's allegations of diminished memory and concentration. (R. at 226.) Milan found Mullins's mental allegations to be only partially credible. (R. at 226.) He determined that her condition was not so severe as to disable her from all work, even at the time of the evaluation. (R. at 226.) Milan's assessment was affirmed by Julie Jennings, Ph.D., on July 6, 2005. (R. at 226.)

Dr. Frank M. Johnson, M.D., a state agency physician, completed a residual

physical functional capacity assessment on July 12, 2004. (R. at 228-35.) Dr. Johnson found that Mullins retained the ability to occasionally lift and/or carry items weighing up to 20 pounds and frequently lift and/or carry items weighing up to 10 pounds. (R. at 229.) He also determined that Mullins was able to stand and/or walk for a total of about six hours in a typical eight-hour workday and to sit for a total of about six hours in a typical eight-hour workday. (R. at 229.) According to Dr. Johnson, Mullins was unlimited, other than as noted for lifting and carrying, in her ability to push and/or pull. (R. at 229.) Dr. Johnson determined that Mullins's allegations were not fully supported by the evidence, and, thus, not fully credible. (R. at 230.) No manipulative, communicative, visual or environmental limitations were noted. (R. at 231-33.) However, Mullins was found to be limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling. (R. at 231.) Dr. Johnson's findings were affirmed by Dr. Richard M. Surrusco, M.D., on November 23, 2004. (R. at 235.)

Mullins also sought treatment from Deidre F. Taylor, LCSW, from October 18, 2004, to December 7, 2004. (R. at 236-68.) At the initial evaluation on October 18, 2004, Taylor noted that Mullins was taking Zoloft, Ultram, Valium and Percocet. (R. at 265.) Mullins reported sleeping difficulties, anhedonia, irritability, decreased appetite, decreased energy, concentration difficulties, increased forgetfulness and retarded motor activity. (R. at 265.) Taylor noted that Mullins had a history of panic attacks and anxiety. (R. at 266.) Mullins reportedly displayed a dysphoric mood and an appropriate affect. (R. at 267.) Mullins denied any homicidal ideations, but Taylor marked "able to contract" in reference to suicidal ideations. (R. at 267.) Mullins's judgment, insight and cognitive abilities were reported to be intact, while

her abstraction skills were impaired. (R. at 267.) Taylor identified major problems in the following areas: decreased cognition, decreased ability to cope, decreased psycho social skills, decreased attention/concentration, decreased reality orientation and decreased memory, as well as increased depression, anxiety and somatic preoccupation. (R. at 268.) Taylor recommended individual psychotherapy two times a week, with a treatment plan aimed at addressing each of the major problems previously identified. (R. at 268.)

Mullins saw Taylor again on October 26, 2004, and Mullins explained that her aunt had passed away and that she felt like she was "going crazy." (R. at 262.) Mullins also alleged suicidal thoughts. (R. at 262.) In addition to many of the symptoms noted during her initial visit, Mullins reported uncontrollable, daily crying spells, as well as feelings that had worsened since her first visit, such as hopelessness, helplessness and being overwhelmed. (R. at 262.) Taylor noted severe depression and anxiety, moderate to severe panic, severe obsessive thoughts, severe social phobia and severe pain. (R. at 262.) Additionally, Taylor assessed Mullins's current GAF score at 42. (R. at 263.) Taylor indicated that Mullins still showed signs of the majority of the major problems identified at the initial visit. (R. at 264.) However, at the second visit, Taylor did not note decreased cognition, decreased reality orientation or increased somatic preoccupation. (R. at 264.) Mullins's treatment plan was unchanged and her progress was noted as average. (R. at 263-64.)

On November 5, 2004, Taylor completed a mental status evaluation form. (R. at 257-61.) Taylor noted that Mullins experienced great difficulty in dealing with all aspects of her life since her April 2004 car accident. (R. at 257.) Mullins alleged

family problems and a history of alcohol abuse. (R. at 257.) In addition, she explained that she often found herself yelling and screaming and that she did not want to be around friends or family. (R. at 258.) Mullins also reported severe sleeping problems, decreased energy and appetite and increased pain. (R. at 258.) Further, Mullins alleged a decrease in her daily activities, and claimed that she could no longer work. (R. at 258.) Taylor noted that Mullins's attitude and behavior, as well as her mood, affect and emotional lability were unstable, and that Mullins had a sad affect and was anxious regarding her current life situation. (R. at 259.) Taylor also reported that Mullins had previously admitted to suicidal ideations and that she was able to contract for safety. (R. at 259.) Taylor indicated that Mullins's memory was impaired and that her thought content and organization was jumbled, which resulted in frustration with her overall abilities. (R. at 259.) Furthermore, Taylor noted increased confusion, which was attributed to Mullins's post concussion syndrome. (R. at 260.) Mullins's attention span, concentration, persistence and task completion was decreased, and she was unable, at the time of the evaluation, to perform calculations and abstract reasoning. (R. at 260.) Her judgment and fund of information was said to be limited. (R. at 260.) Taylor determined that, due to Mullins's post concussion syndrome, Mullins's IQ score would be lower than normal because of her inability to focus and concentrate. (R. at 260.)

Mullins presented to Taylor again on November 8, 2004, and her symptoms and complaints remained relatively unchanged. (R. at 253-56.) Taylor reported that Mullins remained suicidal and felt hopeless, helpless and overwhelmed. (R. at 254.)

During this visit, Taylor assessed Mullins's GAF score at 40,[5] which represented a lower score than was noted in the previous evaluation. (R. at 255.) Taylor recommended hospitalization to treat Mullins's problems. (R. at 255.) As such, Mullins was admitted to BRMC on November 8, 2004, and discharged on November 12, 2004.[6] (R. at 269-75.)

On November 16, 2004, Mullins presented to Taylor and stated that she was feeling better and that she had hope. (R. at 250.) Mullins indicated that she had experienced bad headaches, and Taylor noted that Mullins's thoughts remained scattered and her motor skills had decreased. (R. at 250.) At this visit, Mullins reported no sleep problems, improved energy, lessened crying spells, improved interest in activities and improvements in her feelings of hopelessness, helplessness and being overwhelmed. (R. at 250.) Taylor opined that Mullins benefitted from the hospital stay and that Mullins exhibited feelings of hope. (R. at 251.) Taylor reported a good response to treatment and continued the treatment plan without change. (R. at 252.) Taylor assessed Mullins's GAF score at an improved mark of 46. (R. at 252.)

Mullins again presented to Taylor on November 22, 2004, and complained of continued short-term memory loss. (R. at 246.) Mullins's symptoms and complaints remained virtually unchanged, and her treatment was reduced to one time a week. (R.

---

[5] A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV at 32.

[6] The medical records from Mullins's hospital stay will be discussed in more detail later in this section.

at 249.)

On December 7, 2004, Mullins presented to Taylor and alleged that her memory and concentration abilities were "awful," causing her to lose thoughts in mid-sentence. (R. at 242.) She also reported worsened feelings of hopelessness, helplessness and being overwhelmed. (R. at 242.) Taylor noted that Mullins was having difficulties with increased pain and that her thoughts remained jumbled. (R. at 243.) Also, Mullins explained that her family was having a difficult time adjusting to the fact that she could no longer be the caretaker of the family. (R. at 243.) Taylor reported a good response to treatment and continued according to the same treatment plan on a weekly to biweekly schedule. (R. at 244-45.)

Taylor completed another mental status evaluation form on December 7, 2004. (R. at 237-41.) Taylor explained that Mullins experienced difficulty dealing with day to day life and that she was having problems dealing with the frequency of her medical appointments. (R. at 237.) Mullins again noted that her family did not like the fact that she was no longer able to be the caretaker. (R. at 237.) Taylor noted increased verbal aggression when frustrated and an increase in seclusiveness. (R. at 238.) Mullins reported improvement in appetite and sleeping problems, but noted an increase in pain. (R. at 238.) Mullins also reiterated suicidal thoughts by stating that she would be "better off dead." (R. at 239.) Her memory and thought content and organization was reported as severely impaired. (R. at 239.) Additionally, Taylor noted increased confusion, and poor attention span, concentration, persistence and task completion. (R. at 240.) Mullins's judgment was reported as fair and her fund of information was good; however, she was unable to perform calculations and

abstract reasoning. (R. at 240.) Taylor determined that Mullins was not able to manage her own funds. (R. at 241.)

As mentioned earlier, Mullins's was hospitalized at BRMC from November 8, 2004, to November 12, 2004, where she was admitted on a voluntary basis. (R. at 269-75.) Upon examination, Mullins's range of motion appeared slightly limited due to previous knee injuries and her hip movement was limited as well. (R. at 274.) Swelling was noted near Mullins's coccygeal line. (R. at 274.) The assessment revealed major depressive disorder, recurrent, without psychotic features. (R. at 274.) Moreover, in relevant part, the assessment noted post concussion syndrome, chronic pain problems and problems related to her primary support group. (R. at 274-75.) Upon admission, Mullins's GAF score was assessed at 35. (R. at 275.) While hospitalized, Mullins was placed on suicide and AWOL precautions. (R. at 275.) The treatment plan was to involve Mullins in group and milieu activities. (R. at 275.) Furthermore, her medications were adjusted, as she was given Remeron 30 mg at bedtime, Valium 10 mg three times a day, Endocet 10/325 every six hours, Flexeril 10 mg three times a day and Reminyl 2 mg twice a day. (R. at 275.) Mullins also was given Celebrex 100 mg daily, an E-Hobb mattress for her back and thiamine 100 mg twice a day. (R. at 275.) Mullins was placed on Depakote Sprinkles 125 mg three times a day to treat mild agitation. (R. at 270-71.)

During the latter part of Mullins's hospitalization, the medical records show that the focus was on pain treatment rather than depressive symptoms. (R. at 271.) Because Mullins requested to go home, and because she was not suicidal or homicidal, it was determined that Mullins was stable enough to be discharged. (R.

at 271.) Upon discharge, Mullins was diagnosed as follows: major depressive disorder, recurrent, severe without psychotic features; post concussion syndrome; chronic pain problems; migraine headaches; problems related to primary support group and access to health care due to economic issues. (R. at 269.) Her GAF was assessed as approximately 50 to 55 upon discharge. (R. at 269.) Mullins's condition was reported as improved and her anxiety symptoms had decreased. (R. at 269.) Additionally, her depressive symptoms were improved and her pain and headache complaints were medically stable. (R. at 269.) Mullins was prescribed Depakote Sprinkles 125 mg, Reminyl 4 mg and Remeron 30 mg. (R. at 269.)

## II. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 28, 2006, the ALJ denied Mullins's claims. (R. at 17-24.) The ALJ found that Mullins met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 23.) The ALJ determined that Mullins had not engaged in substantial gainful activity at any time pertinent to his decision. (R. at 23.) The ALJ also found that Mullins suffered from a musculoskeletal impairment related to her bilateral hip pain and an emotional disorder, which he considered "severe" based on the requirements of 20 C.F.R. §§ 404.1520(b) and 416.920(b). (R. at 23.) However, the ALJ determined that Mullins did not have an impairment or combination of impairments that met or medically equaled the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) In addition, the ALJ found that Mullins's allegations regarding her limitations were not totally credible. (R. at 24.) The ALJ also found that Mullins possessed the residual functional capacity to perform light and sedentary work, and that she suffered from an emotional disorder that resulted in mild to moderate restrictions regarding her ability to perform work-related activities. (R. at 24.) The ALJ found that Mullins's past relevant work as a sewing machine operator did not require the performance of the work-related activities precluded by her residual functional capacity; thus, he

concluded that Mullins's impairments did not prevent her from performing her past relevant work. (R. at 24.) In the alternative, the ALJ pointed out that, even if Mullins was unable to perform her past relevant work, she would still be able to perform other jobs that exist in significant numbers in the regional and national economies, including light work jobs as a cleaner, a miscellaneous food prep worker, a machine operator, an inspector, a hand packer and an administrative support worker, and sedentary work jobs as an inspector, a hand packer, an information clerk, a dispatcher and an administrative support worker. (R. at 23.) Therefore, the ALJ found that Mullins was not under a "disability" as defined under the Act and was not entitled to benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

Mullins argues that ALJ erred in relying upon the opinion of the vocational expert because the opinion was in response to an incomplete hypothetical question posed by the ALJ. (Plaintiff's Brief in Support of Motion for Summary Judgment), ("Plaintiff's Brief"), at 8-10.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Mullins's sole argument is that the hypothetical question posed by the ALJ was not proper because it was not based upon all the evidence in the record; instead, Mullins contends that the hypothetical was a piecemeal question that "fragmentized" her impairments. (Plaintiff's Brief at 9.) Mullins argues that the hypothetical was posed in two stages in order to avoid a finding that she was disabled. (R. at 9.) I disagree.

In order to address the claimant's argument, it is necessary to examine the hypothetical question the ALJ posed to the vocational expert at the administrative hearing. Testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where his or her opinion is based upon a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of a claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50

(4th Cir. 1989). The determination of whether a hypothetical question fairly sets out all of a claimant's impairments turns on two issues: 1) whether the ALJ's finding as to the claimant's residual functional capacity is supported by substantial evidence; and (2) whether the hypothetical adequately set forth the residual functional capacity as found by the ALJ.

In this case, the ALJ found that Mullins retained the residual functional capacity to perform work at the light and sedentary levels of exertion, with an emotional disorder that resulted in mild to moderate restrictions regarding Mullins's ability to perform work-related activities. (R. at 24.) At the administrative hearing, in posing a hypothetical question to the vocational expert, the ALJ specifically asked the expert to "assume a woman of the claimant's height, weight, education[] and work background [who retained] the residual functional capacity for light and sedentary work activities [and] an emotional disorder [with] mild to moderate restrictions regarding her ability to perform work activities." (R. at 324.) Based upon those restrictions, the ALJ asked if there were any jobs within the national or regional economies that Mullins was capable of performing. (R. at 324.)

In reviewing the medical evidence, it is clear that Dr. Johnson, a state agency physician, determined that Mullins was capable of occasionally lifting and/or carrying items weighing up to 20 pounds and frequently lifting and/or carrying items weighing up to 10 pounds. (R. at 229.) Thus, according to Dr. Johnson, Mullins possessed the ability to perform both light and sedentary work. *See* 20 C.F.R. §§ 404.1567(a),(b), 416.967(a), (b) (2007). Moreover, Dr. Johnson's findings were affirmed by Dr. Surrusco on November 23, 2004. (R. at 235.) It also should be noted that Dr.

Peterson opined that Mullins's medical conditions were resolved and/or stabilized, and that she was able to return to her employment and "become a productive part of society once again." (R. at 200.) Therefore, based upon the above-mentioned medical evidence, I am of the opinion that substantial evidence exists to support the ALJ's finding that Mullins retained the residual functional capacity to perform both light and sedentary work.

Next, I must determine whether the hypothetical question adequately set forth Mullins's residual functional capacity as found by the ALJ. After examining the ALJ's findings and the hypothetical that was posed to the vocational expert, it appears that the ALJ set forth a hypothetical question that virtually mirrored his residual functional capacity finding. (R. at 24, 324.) In my opinion, it is abundantly clear that the ALJ posed a hypothetical that was entirely consistent with his residual functional capacity finding. Accordingly, the Commissioner's decision shall be affirmed.

## IV. Conclusion

For the foregoing reasons, I will sustain the Commissioner's motion for summary judgment and decision denying benefits, and I will overrule Mullins's motion for summary judgment.

An appropriate order will be entered.

DATED:    This _14th_ day of February, 2008.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE